UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MENTE GROUP LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>ARNELL ENTERPRISES, INC,<br><br>    Defendant. | Case No. 20-cv-07459-VKD<br><br>**ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 37 |

This dispute arises out of an aircraft acquisition agreement between plaintiff Mente Group, LLC ("Mente") and defendant Arnell Enterprises, Inc. ("Arnell"). Asserting diversity jurisdiction under 28 U.S.C. § 1332(a), Mente brings a single cause of action against Arnell for breach of contract. Dkt. No. 1. In its answer, Arnell asserts several affirmative defenses and counterclaims. Dkt. No. 11.

Mente now moves for summary judgment on its claim for breach of contract, Arnell's counterclaim for breach of contract, Arnell's counterclaim for slander of title, and nine of Arnell's affirmative defenses. Dkt. No. 37. Arnell opposes the motion as to some, but not all, of these claims and defenses. Dkt. No. 40. Upon consideration of the moving and responding papers and the oral arguments presented at the hearing on December 7, 2021, the Court grants plaintiff's motion for partial summary judgment.[1]

---

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.  BACKGROUND

### A.  Undisputed Facts

Unless otherwise indicated, the following facts are not disputed.

Mente is a Texas company that provides consulting and transactional services to private aircraft owners and operators. Dkt. No. 37-1, Ex. A ¶¶ 2, 3. Arnell is a "diversified, multi-divisional development company" incorporated in California. Dkt. No. 40-1, Ex. D ¶ 2. Arnell has owned and operated aircraft as part of its business operations. Dkt. No. 40-1, Ex. D ¶¶ 2, 3. In or around September 2017, Arnell's Chief Executive Officer, Roger Burnell, began discussions with Mente concerning Arnell's potential acquisition of an Embraer Phenom 300E aircraft. Dkt. No. 37-1, Ex. A ¶¶ 3, 11–12; Dkt. No. 40-1, Ex. D ¶¶ 2, 11; Dkt. No. 40-1, Ex. D ¶¶ 11–12. Mente initially proposed to assist Arnell with acquiring the aircraft for a flat fee of $150,000.00. Dkt. No. 37-1, Ex. A ¶ 4; Dkt. No. 40-1, Ex. D ¶ 11. Arnell did not accept Mente's flat fee proposal; instead, the parties agreed that Mente would be compensated based on a percentage of the savings it obtained on Arnell's behalf for the purchase of the aircraft. Dkt. No. 37-1, Ex. A ¶ 5; Dkt. No. 37-1, Ex. B ¶ 4; Dkt. No. 40-1, Ex. D ¶ 11.

On August 22, 2018, Mr. Burnell sent an email to Jim Lewis (Mente's Senior Managing Director), forwarding an email Mr. Burnell had received on August 3, 2018 from an Embraer representative, Doug Giese. *Id.*, Ex. B-3. Mr. Burnell wrote in his cover email: "Hi Jim – as promised. This is the present starting point for an expensive journey." *Id.* The email referenced the price for a Phenom 300E DN-32 aircraft, and stated, in relevant part:

```
Base:       $9[,]450,000.00
Options:    $1,023,650.00
Total:      $10,473,650.00
```

*Id.* Later that day, Mr. Burnell sent another email to Mr. Lewis asking for the projected five-year depreciation of a new Phenom 300E aircraft. *Id.* In this email, Mr. Burnell wrote: "They are 'asking' $10.5M for the bird, with NO negotiations off of 'list' allowed!" *Id.*

On September 19, 2018, Mr. Lewis sent an email to Mr. Burnell with a calculation of the "as-equipped value" of the Phenom 300E aircraft, stating: "It's $1.020M in options. Plus the $9.450M base, that's obviously $10.470M. That's the 'what'. Haven't delved into that [*sic*]

2

'when'. We're ready for the 'how'. If this is the jet you want, engage us and let us go to work. It's what we do." *Id.*, Ex. B-4.

In late September 2018, Arnell and Mente entered into a written contract, titled "New Aircraft Acquisition and Completion Management Agreement" ("Agreement"). *Id.*, Ex. A-1 at 1; Dkt. No. 40-1, Ex. D ¶¶ 14–15. Brian Proctor, Mente's President and Chief Executive Officer, signed the Agreement on September 26, 2018 on behalf of Mente, and Mr. Burnell signed the Agreement on behalf of Arnell (his signature is not dated, but Mr. Burnell avers that he signed the Agreement on September 24, 2018). Dkt. No. 37-1, Ex. A-1 at 2; Dkt. No. 37-1, Ex. A ¶ 6; Dkt. No. 37-1, Ex. C-1 at 24; Dkt. No. 40-1, Ex. D ¶ 15. The Agreement provides that Mente shall act as Arnell's "sole and exclusive agent in connection with the purchase or lease of a new aircraft." Dkt. No. 37-1, Ex. A-1 at 1. Mente agreed to "advise and negotiate on all aspects of the aircraft transaction," including: "[r]eview[ing] negotiations to date," "[d]evelop[ing] negotiation strategy," "prepar[ing] and distribut[ing] RFP," "[p]repar[ing] counter-proposals and related correspondence required to negotiate terms of LOI and Purchase Agreement," and "develop[ing] aircraft specifications based upon your criteria." Dkt. No. 37-1, Ex. A-1 at 1 ¶ 2; Dkt. No. 45, Ex. 1 at 1 ¶ 2.[2]

In return, Arnell agreed to pay Mente a fee as follows:

> **Fee** – [ARNELL] agrees to pay MENTE a total fee of $15,000 plus an additional 27.5% of the savings between the purchase price on the final aircraft purchase agreement executed with Embraer and the current proposal [ARNELL] has received from Embraer for a $9.45M base aircraft with $1.02M in options (the "Fee") for the services listed above. This is an initial outline/estimate subject to finalization of Options valued at List Price. The Fee shall be paid in two installments: $15,000.00 shall be due MENTE upon execution of this Agreement. The balance of the Fee shall be due MENTE and paid via

---

[2] On December 10, 2021, the parties jointly submitted a supplemental exhibit containing a draft of the Agreement that the parties stipulate is "substantially identical to the final version of the Agreement," with the exception that the exhibit has not been signed by the parties. Dkt. No. 45. The parties further stipulate that "[a]ll revisions reflected in [the exhibit] are incorporated in the final draft of the Agreement, and no other changes were made prior to execution of the Agreement." *Id.* This supplemental exhibit includes text that is illegible in the final signed version of the Agreement that is part of the record. With the agreement of the parties, the Court relies on the text shown in the supplemental exhibit where that same text is illegible in the final signed Agreement.

3

wire transfer upon the closing and successful passing of the title of the Aircraft.

Dkt. No. 37-1, Ex. A-1 at 2 ¶ 8; Dkt. No. 45, Ex. 1 at 2 ¶ 8. The Agreement also contains a section subtitled "Expense Reimbursement," in which Arnell agreed to reimburse Mente for its out-of-pocket expenses, including travel, meals, lodging, local transportation, advertising, and inspection costs, which would be due "within thirty days of the date on the invoice." *Id.*, Ex. A-1 at 2 ¶ 9, 3 ¶ 11.

The Agreement's "Choice of Law" subsection, which also includes an integration clause, states: "This Agreement is to be governed by and construed in accordance with the laws of Texas, without regard to its conflict of law principles. . . . This Agreement constitutes the entire agreement between MENTE and [ARNELL] with respect to the subject matter contained herein and supersedes all prior agreements oral or written. This Agreement may only be amended or modified by a written instrument signed by both parties." *Id.*, Ex. A-1 at 3 ¶ 7.

After signing the Agreement, Mente began negotiating with Embraer on Arnell's behalf for purchase of a Phenom 300E aircraft. *Id.*, Ex. A ¶ 11. At some point during these negotiations, Arnell selected additional optional equipment with a higher list price than the "$1.02 million" figure stated in the Agreement. Dkt. No. 37-1, Ex. A ¶ 12. On December 18, 2018, Mente sent a counterproposal to Embraer on Arnell's behalf to purchase the Phenom 300E aircraft, including options valued at $1,136,800.00, for a total purchase price of $9,450,000.00. *Id.*, Ex. A ¶ 12; *id.*, Ex. A-2 at 2–3.

On December 31, 2018, Arnell and Embraer entered into an agreement for the purchase and sale of the Phenom 300E aircraft for $9,450,000, the same amount Mente had proposed to Embraer on December 18, 2018. *Id.*, Ex. C-1 at 153:10-154:20; *id.*, Ex. C-4 at 1, 8–9; Dkt. No. 40-1, Ex. D ¶ 20; Dkt. No. 40-2, Ex. D-14 at 1. In September 2019, Arnell completed the closing on the aircraft, and title to the aircraft passed to Arnell. Dkt. No. 40-1, Ex. D ¶ 21; *see also* Dkt. No. 17 at 3 ¶ 9.

On September 3, 2019, Mente prepared a final invoice for the work it had performed

4

1   under the Agreement.[3]  Dkt. No. 37-1, Ex. A-3; Dkt. No. 40-1, Ex. D ¶ 21.  The invoice calculates
2   the value of the "Transactions Services," or "27.5% of savings between purchase price on final
3   [aircraft purchase agreement] and the current proposal from Embraer," as $312,620.00.  *Id.*, Ex.
4   A-3 at 1.  The invoice also included $1,527.96 in expenses Mente incurred.  *Id.*, Ex. A-3 at 2.  The
5   invoice lists the total owed to Mente as $314,147.96.  *Id.*, Ex. A-3 at 1.  On October 11, 2019,  Mr.
6   Proctor (Mente's CEO) sent Mr. Burnell (Arnell's CEO) a letter referencing the invoice and
7   demanding payment by October 21, 2019.  Dkt. No. 37-1, Ex. A ¶ 16; *id.*, Ex A-4.  Arnell did not
8   pay the invoice.  Dkt. No. 37-1, Ex. A ¶¶ 16–17; *id.*, Ex. C-1 at 159.

On November 6, 2019, Mente filed a mechanic's lien on the aircraft.  Dkt. No. 37-1, Ex. A ¶ 17; Dkt. No. 40-1, Ex. D ¶ 22.  The lien stated that Mente had a claim against Arnell for the sum of $315,601.88 "for the performance of services that include repair or maintenance of the aircraft."  Dkt. No. 37-1, Ex. A-5; Dkt. No. 40-1, Ex. D ¶ 22.  Arnell then paid $150,000 to Mente on or around November 25, 2019.  Dkt. No. 37-1, Ex. C-1 at 173:19-22; Dkt. No. 40-1, Ex. D ¶ 21.  Arnell has not paid the remainder of the September 3, 2019 invoice ($164,147.96).

## B.    Procedural Posture

On October 23, 2020, Mente filed this action, asserting one claim for breach of contract against Arnell.  Dkt. No. 1.  Arnell answered on January 5, 2021 with counterclaims for breach of contract, slander of title, and declaratory relief, as well as a counterclaim to quiet title to the aircraft upon which Mente filed a mechanic's lien.  Dkt. No. 11 at 10–15.  In its answer, Arnell also asserted twelve affirmative defenses.  *Id.* at 6–9.  On October 19, 2021, Mente now moves for partial summary judgment in its favor on (1) its claim against Arnell for breach of contract, (2) Arnell's counterclaims for breach of contract and slander of title, and (3) nine of Arnell's affirmative defenses.  Dkt. No. 37.  Arnell opposes Mente's motion for summary judgment on Mente's breach of contract claim against Arnell.  Dkt. No. 40.  Mente filed its reply on November 23, 2021.  Dkt. No. 41.  The Court held a hearing on the motion on December 7, 2021.  Dkt. No. 43.  At the hearing, Arnell confirmed that it does not oppose Mente's motion for partial summary

---

[3] The record does not reflect when Mente first sent the invoice to Arnell.

5

1  judgment on Arnell's counterclaim for slander of title; further, but for its affirmative defense of
2  unclean hands, Arnell does not oppose Mente's motion for partial summary judgment on its
3  affirmative defenses. *Id.*

## II.     LEGAL STANDARD

The standard that applies to a motion seeking "partial summary judgment is identical to the standard for a motion seeking summary judgment of the entire case." *Kennedy v. United States Citizenship and Immigration Servs.*, 871 F. Supp. 2d 996, 1006 (N.D. Cal. 2012) (citation omitted). A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party moving for summary judgment who bears the burden of proof at trial must produce evidence that would entitle the party to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000). A party moving for summary judgment who does not have the ultimate burden of persuasion at trial "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden at summary judgment, the burden then shifts to the nonmoving party to go beyond the pleadings and designate specific materials in the record to show that there is a genuinely disputed material fact. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. The nonmoving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence showing a genuine issue of material fact for trial. *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102. It is not the Court's task to "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.

1996). A genuine issue for trial exists if the nonmoving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Anderson*, 477 U.S. 242 at 248–49. The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

### A. Breach of Contract

As an initial matter, the parties agree that Texas law applies to Mente's breach of contract claim, consistent with the Agreement's choice of law of provision. Dkt. No. 37 at 7 n.2; Dkt. No. 37-1, Ex. A-1 at 3 ¶ 7; Dkt. No. 40 at 9. Under Texas law, the elements of a breach of contract claim are: (a) a valid contract between plaintiff and defendant; (b) the plaintiff tendered performance or was excused from doing so; (c) the defendant breached the contract; and (d) the plaintiff sustained damages as a result of the breach. *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App. 2008). "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Case Corp. v. Hi-Class Bus. Sys. of America, Inc.*, 184 S.W.3d 760, 769 (Tex. App. 2005) (citation omitted).

The parties do not dispute that the Agreement is a valid contract; that Mente successfully negotiated with Embraer for the purchase of a Phenom 300E aircraft;[4] and that Arnell paid Mente no more than $150,000, in addition to the $15,000 initial fee. *See* Dkt. No. 40; Dkt. No. 37-1, Ex. A-1 at 1 ¶ 1–7, Ex. B ¶ 13, Ex. B-5, Ex. C-2 at 91–92, 95; Dkt. No. 17 at 3 ¶ 6. They disagree regarding what the Agreement requires before Mente may obtain a fee reflecting "27.5% of the savings" Mente obtained on Arnell's behalf, and whether that requirement was ever fulfilled. Mente argues that the fee provision clearly identifies the reference point for calculating savings as

---

[4] It is undisputed that Mente performed its contractual obligation to negotiate the purchase and sale of the Phenom 300E aircraft under the Agreement. *See* Dkt. No. 37-1, Ex. A-1 at 1 ¶¶ 1–3; Dkt. No. 45, Ex. 1 at 1 ¶¶ 1–3; Dkt. No. 17 at 3 ¶ 6. To the extent that Mente personnel did not attend the final inspection of the aircraft, Mente has produced evidence that its attendance was excused by Mr. Burnell's specific request that Mente personnel not attend this inspection. Dkt. No. 37-1, Ex. B ¶ 13; *id.*, Ex. B-5; *id.*, Ex. C-2 at 91–92. Arnell does not dispute Mente's evidence.

7

"the current proposal [ARNELL] has received from Embraer for a $9.45M base aircraft with $1.02M in options . . . subject to finalization of Options valued at List Price." Dkt. No. 37 ¶¶ 22, 25, 28. Mente contends that, consistent with this provision, the final reference price was $10,586,800 ($9,450,000 base, plus $1,136,800 in options), that it negotiated with Embraer for a purchase price of $9,450,000, and obtained savings for Arnell of $1,136,800. Dkt. No. 37 ¶ 22; Dkt. No. 37-1, Ex. A ¶¶ 12–13; *id.*, Ex. A-2. Arnell argues that it never received a proposal from Embraer, and, therefore, there was never a reference price with respect to which Mente could obtain any savings on Arnell's behalf. Dkt. No. 40 at 5–6, 10. Specifically, Arnell contends that the August 3, 2018 email Mr. Burnell received from Embraer was not a "proposal" because it merely stated the aircraft's "list price." Dkt. No. 40 at 5–6, 10–12. Arnell argues that "at best" the fee provision is ambiguous, and that the ambiguity must be resolved by a trier of fact. Dkt. No. 40 at 1, 8, 10–12.

### 1. Contract interpretation

The Court first considers the parties' competing arguments regarding the terms of the Agreement, including whether the critical fee provision is ambiguous. Contract terms must be given their "plain and ordinary meaning" unless the contract itself shows that the parties used those terms in a different sense. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) (citation omitted). Whether a contract is ambiguous is a legal question for the Court. *Id.* (citation omitted). "A contract is not ambiguous simply because the parties disagree over its meaning." *Id.* "A contract is ambiguous when its meaning is uncertain or is reasonably susceptible to more than one interpretation." *Id.* (citation omitted). "In determining whether a contract is ambiguous, courts construe and harmonize all provisions of the contract to discern the parties' intent. [citations omitted] This inquiry also considers the context of the agreement of the parties and the circumstances present when the agreement arose," *Pitts & Collard, LLP v. Schechter*, 369 S.W.3d 301, 313 (Tex. App. 2011) (citing *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996)), as well as "all writings pertaining to the same transaction," *id.* (citing *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999)).

8

The fee provision is not ambiguous because its meaning is neither uncertain nor reasonably susceptible to more than one interpretation. The Agreement clearly states that Mente's fee is "$15,000 plus an additional 27.5% of the savings between the purchase price on the final aircraft purchase agreement executed with Embraer" and "the current proposal" Arnell "has received from Embraer for a $9.45M base aircraft with $1.02M in options," and that these options were subject to finalization and calculation at "List Price." Dkt. No. 37-1, Ex. A-1 at 2 ¶ 8; Dkt. No. 45, Ex. 1 at 2 ¶ 8. The fee provision refers to a "current proposal" that Arnell "has received from Embraer," indicating that as of the date of the final Agreement signed in late September 2018, Arnell was already in possession of the proposal from Embraer to which the Agreement refers, even if the options were not yet final. Nothing in the Agreement suggests that the proposal from Embraer to Arnell had yet to be received, or that after signing the Agreement, Arnell would independently solicit a proposal from Embraer.

This conclusion is consistent with other provisions of the Agreement. In its preamble, the Agreement states that "[ARNELL] hereby appoints MENTE to act as [ARNELL]'s sole and exclusive agent in connection with the purchase or lease of a new aircraft (the "Aircraft")." Dkt. No. 37-1, Ex. A-1 at 1; Dkt. No. 45, Ex. 1 at 1. The Agreement further states that "MENTE will advise and negotiate on all aspects of the aircraft transaction, including specific tasks enumerated in the Agreement. Dkt. No. 37-1, Ex. A-1 at 1 ¶ 2; Dkt. No. 45, Ex. 1 at 1 ¶ 2. Arnell's contention that the fee provision contemplates that Arnell would separately obtain a proposal from Embraer after retaining Mente as Arnell's sole and exclusive agent in connection with the negotiation and purchase of the aircraft is inconsistent with these other provisions of the Agreement.

The context in which the Agreement was formed also supports the Court's conclusion that the fee provision is not ambiguous. The parties negotiated a fee based on a percentage of savings after Arnell declined Mente's initial proposal of a $150,000 flat fee for its services. Dkt. No. 37-1, Ex. A ¶ 5; Dkt. No. 37-1, Ex. B ¶ 4; Dkt. No. 40-1, Ex. D ¶ 11. Mente's services encompassed all aspects of the negotiation for purchase of the aircraft, including negotiation strategy, the preparation of requests for proposals (or RFPs), development of specifications for the aircraft

9

based on criteria supplied by Arnell, and the preparation of counterproposals. Apart from the $15,000 initial fee, the parties evidently agreed to value Mente's services based on how much money Mente could save Arnell in negotiating a purchase price for the aircraft once Mente was engaged and providing services on Arnell's behalf. This context supports the conclusion that the fee provision's reference to a "current proposal [ARNELL] has received" must be understood as a proposal that Arnell obtained before engaging Mente to act as its sole exclusive agent, as opposed to a proposal that Arnell would obtain in the future after Mente began performing services on Arnell's behalf.

Arnell argues that the drafting history of the Agreement supports a contrary view. Specifically, Arnell points to a draft of the Agreement dated January 9, 2018 in which the fee provision refers to "the current proposal [ARNELL] has received from Embraer," just as in the final Agreement, even though it is undisputed that as of January 9, 2018 Arnell had received no communication from Embraer with any pricing information for the aircraft. Dkt. No. 40 at 10–11. However, this drafting history actually cuts against Arnell's position. The full text of the fee provision as it appears in the January 9, 2018 draft reads as follows:

> **Fee** – [ARNELL] agrees to pay MENTE a total fee of $25,000 plus an additional 33% of the savings between the purchase price on the final aircraft purchase agreement executed with Embraer and *the current proposal [ARNELL] has received from Embraer as of the date of this Agreement* (the "Fee") for the services listed above. The Fee shall be paid in two installments: $25,000.00 shall be due MENTE upon execution of this Agreement. The balance of the Fee shall be due MENTE and paid via wire transfer upon the closing and successful passing of the title of the Aircraft.

Dkt. No. 41-1, Ex. D-3 at 4 ¶ 8 (emphasis added). As Mente correctly observes, the January 9, 2018 draft does not refer merely to "the current proposal [ARNELL] has received from Embraer," but instead refers to "the current proposal [ARNELL] has received from Embraer *as of the date of this Agreement*." *Id.* (emphasis added). This draft is consistent with the undisputed fact that Arnell had received no such proposal as of January 9, 2018 but expected to receive one before executing the Agreement. However, it is also consistent with Mente's position that Arnell did, in fact, receive such a proposal before the Agreement was signed. Indeed, after Arnell received and

10

forwarded to Mente the pricing information Mr. Burnell received from Embraer in August 2018, the parties revised the fee provision. The final version reads as follows:

> **Fee** – [ARNELL] agrees to pay MENTE a total fee of $15,000 plus an additional 27.5% of the savings between the purchase price on the final aircraft purchase agreement executed with Embraer and *the current proposal [ARNELL] has received from Embraer for a $9.45M base aircraft with $1.02M in options* (the "Fee") for the services listed above. *This is an initial outline/estimate subject to finalization of Options valued at List Price*. The Fee shall be paid in two installments: $15,000.00 shall be due MENTE upon execution of this Agreement. The balance of the Fee shall be due MENTE and paid via wire transfer upon the closing and successful passing of the title of the Aircraft.

Dkt. No. 37-1, Ex. A-1 at 2 ¶ 8 (emphasis added); Dkt. No. 45, Ex. 1 at 2 ¶ 8. The final text is consistent with Mente's thesis that, as of the date the Agreement was finally signed by both parties, there was, in fact, a specific "current proposal" that Arnell had received from Embraer, and that the parties agreed that this proposal would be the reference against which the "savings" Mente could obtain for Arnell would be measured.

### 2. Material facts

Having concluded that the fee provision is not ambiguous, the Court now considers whether Mente has demonstrated that there is no genuine issue of material fact in dispute and that it is entitled to judgment as a matter of law that Arnell breached the parties' Agreement. As outlined above, most of the underlying facts are not dispute. Rather, the principal matter in dispute is whether the August 3, 2018 email Mr. Burnell received from Embraer is the "current proposal" to which the fee provision refers. Mente says it is; Arnell says it is not.

In support of its argument that the August 3, 2018 email from Embraer is the "current proposal" to which the fee provision refers, Mente observes that the email contains pricing for a "Phenom 300E DN-32" aircraft that is identical to the pricing referenced in the fee provision as the "current proposal." Dkt. No. 37-1, Ex. A-1 at 2 ¶ 8 ("for a $9.45M base aircraft with $1.02M in options"). In addition, Mente observes that in Mr. Burnell's August 22, 2018 email to Mr. Lewis (a managing director for Mente), Mr. Burnell forwarded the August 3, 2018 pricing with a remark characterizing the Embraer communication as "the present starting point for an expensive

11

1   journey." *Id.* That same day, Mr. Burnell wrote to Mr. Lewis that Embraer was asking $10.5
2   million for the aircraft, without permitting negotiations off the list price. *Id.* Approximately one
3   week before the parties signed the Agreement, Mr. Lewis referenced the same pricing in an email
4   to Mr. Burnell, stating: "It's $1.020M in options. Plus the $9.450M base, that's obviously
5   $10.470M. . . . If this is the jet you want, engage us and let us go to work. It's what we do." *Id.*,
6   Ex. B-4. Mente argues that these email exchanges conclusively demonstrate that the "current
7   proposal" in the fee provision is the proposal Arnell received from Embraer on August 3, 2018,
8   subject to later adjustments to the options.

9       Arnell does not dispute that these email exchanges occurred. However, it argues that the
10  August 3, 2018 pricing from Embraer was not a proposal at all, let alone the "current proposal" to
11  which the fee provision refers. Arnell makes two arguments in support of its position. First,
12  Arnell argues that the parties intended that Arnell would obtain a proposal from Embraer after
13  signing the Agreement. Dkt. No. 40 at 4, 11. Arnell principally relies on the declaration of Mr.
14  Burnell in which he says that after he signed the Agreement on behalf of Arnell, he "intended to
15  prepare a request for quote, and obtain a proposal for the Embraer 300E," and that it "never
16  occurred to [him]" that the Agreement precluded him from engaging in these efforts with Embraer
17  in parallel with Mente in connection with the same aircraft. Dkt. No. 40 at 4, 11; Dkt. No. 40-1,
18  Ex. D ¶¶ 11, 15. In addition, Arnell contends that in advance of signing the Agreement, Mr.
19  Burnell and Mr. Lewis agreed that the parties would obtain proposals in parallel, and that Mente's
20  fee would be based on the difference between these proposals. Dkt. No. 40-3, Ex. E-2, at 109,
21  194. The difficulty with Arnell's argument is that, even accepting Mr. Burnell's testimony as true,
22  evidence of an alleged prior oral agreement is not admissible to vary or contradict the terms of the
23  parties' fully integrated written Agreement. *West v. Quintanilla*, 573 S.W.3d 237, 243 (Tex.
24  2019) (citations omitted) (parol evidence rule "precludes enforcement of any prior or
25  contemporaneous agreement that addresses the same subject matter and is inconsistent with the
26  written contract"); *Pitts & Collard, LLP*, 369 S.W.3d at 313 ("[P]arol evidence of the parties'
27  intent is not admissible to vary the terms of an otherwise unambiguous instrument") (citing *Estes
28  v. Rep. Nat'l Bank*, 462 S.W.2d 273, 275 (Tex. 1970)). As discussed above, the Agreement refers

12

to a "current proposal [ARNELL] has received from Embraer," not a proposal to be obtained in the future, and specifies that Mente will act as Arnell's "sole and exclusive agent" with Embraer in connection with the many tasks necessary for the purchase of the aircraft—including preparing requests for proposals. These provisions are inconsistent with a purported agreement that Arnell would engage independently with Embraer and obtain its own proposal in the future. For this reason, even though Mente disputes Arnell's evidence of a prior agreement, such dispute does not preclude summary judgment.

Second, Arnell argues that the August 3, 2018 email from Embraer is not a proposal at all but merely a disclosure of Embraer's list price for the aircraft. Dkt. No. 40 at 6, 10. Pointing to the differences between the proposals and counterproposals exchanged between Mente and Embraer during the course of negotiations, Arnell contends that the August 3, 2018 email looks nothing like these proposals and counterproposals. Again relying principally on Mr. Burnell's declaration, Arnell says that a "proposal" for purchase of an aircraft requires extensive technical and pricing discussions that Arnell never had with Embraer. Dkt. No. 40-1, Ex. D ¶ 7. In addition, Mr. Burnell states that "[i]t was well known in the industry that Embraer generally discounted the list price of their aircraft by as much as 10% to 12%, and options were discounted as much as 50%," although Mr. Burnell acknowledges that "Embraer had begun to [publicly] state that it was not discounting from List Prices." Dkt. No. 40-1, Ex. D ¶ 9. In short, Arnell contends that because the August 3, 2018 did not include the indicia of a formal proposal for the acquisition of an aircraft, such as might be provided in response to a request for a quote, and did not include any discounts off of list price, it is not the "current proposal" to which the fee provision refers. Dkt. No. 40 at 6–7, 11–12. The difficulty with this argument is that nothing in the Agreement suggests that the "current proposal [ARNELL] has received from Embraer" must be a formal proposal of the type Mr. Burnell describes, or a proposal in any particular format; likewise nothing in the Agreement suggests that the "current proposal" cannot be at list price.[5] Arnell's argument that a genuine dispute of fact exists regarding the nature of a "proposal" might be more compelling

---

[5] The record before the Court includes no testimony from any Embraer representative on this point, and no expert testimony.

13

1    if Arnell could point to some other communication from Embraer that it contended was the
2    "current proposal" instead of the August 3, 2018 email. But Arnell does not identify any such
3    other communication; rather, it contends that it never received *any* proposal from Embraer for the
4    aircraft.[6] This contention is simply inconsistent with the language of the Agreement, which refers
5    to the "current proposal [ARNELL] *has received* from Embraer" (emphasis added). For this
6    reason, even if the Court views Arnell's evidence in the light most favorable to it, a reasonable
7    finder of fact could not conclude that, contrary to the terms of the fee provision, no "current
8    proposal" from Embraer existed.

9    Finally, Arnell argues that if the August 3, 2018 is the "current proposal" of the fee
10   provision, Mente would be entitled to collect a fee that is more than twice its original proposal,
11   which was to provide services to Arnell in exchange for a $150,000 flat fee—a proposal Arnell
12   rejected. Dkt. No. 40 at 7–8; Dkt. No. 40-1, Ex. D ¶ 21. To the extent Arnell suggests that it
13   should have to pay no more than $150,000 to Mente because Mr. Lewis told Mr. Burnell that a fee
14   based on a percentage of Arnell's savings would be less than $150,000 (Dkt. No. 40-1, Ex. D ¶ 11;
15   Dkt. No. 40-3, Ex. E-2 at 169–70, 183), evidence of such a communication from Mr. Lewis is
16   inadmissible to vary the terms of the Agreement. *West*, 573 S.W.3d at 243; *Pitts & Collard, LLP*,
17   369 S.W.3d at 313. To the extent Arnell contends such a result is simply unfair, it has failed to
18   develop and support any such defense.

19   For these reasons, the Court concludes that there is no genuine dispute of fact that the
20   August 3, 2018 email Arnell received from Embraer is the "current proposal" to which the fee
21   provision refers. As Arnell does not dispute Mente's math concerning the amount of the fee and
22   reimbursable expenses that remain unpaid, the Court finds that the evidence of record establishes

---

[6] Arnell asserts that when asked directly whether he thought the August 3, 2018 email was the "current proposal" referenced in the Agreement, Mr. Lewis testified, "I don't know" and "I don't remember." Dkt. No. 40 at 10. Arnell's assertion mischaracterizes Mr. Lewis's testimony. The transcript of Mr. Lewis's deposition indicates that he gave those answers in response to questions about the January 2018 draft of the Agreement, not the final version signed by the parties. *See* Dkt. No. 40-3, Ex. E-1 at 51. When asked whether the "9.45 million and the 1.02 million" numbers in a later draft of the Agreement (i.e., one that post-dated the August 3, 2018 email) were list prices, Mr. Lewis responded: "It happens to comport with list price, but we asked Roger [Burnell] for the pricing he had, he showed me that email, and that's where we based our fees on." *Id.* at 63.

14

that Arnell owes Mente $164,147.96 under the Agreement.

Accordingly, the Court grants Mente's motion for summary judgment on its breach of contract claim.

### B. Arnell's Counterclaims

#### 1. Arnell's counterclaim for breach of contract

Mente argues that it is entitled to summary judgment on Arnell's counterclaim that Mente breached its contract with Arnell. Arnell asserts that Mente breached the Agreement by (1) requesting payment in excess of the amount Mente was entitled to recover according to the terms of the Agreement, (2) preventing Arnell from receiving a proposal from Embraer in parallel to and independent of Mente's efforts, and (3) filing a mechanic's lien on the Phenom 300E aircraft that claimed a sum of $315,601.88. Dkt. No. 11 at 11–12. Arnell did not respond on the merits to Mente's motion for summary judgment on Arnell's breach of contract counterclaim. *See* Dkt. No. 40. Further, at the December 7, 2021 hearing, Arnell was unable to explain how any of Mente's actions breached the Agreement.

For the reasons explained in Mente's motion for summary judgment, the Court agrees that Arnell has not come forward with any evidence or argument supporting its breach of contract counterclaim against Mente. Therefore, the Court concludes that Arnell has not met its burden in opposing summary judgment on a claim for which it would bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

Accordingly, the Court grants summary judgment in favor of Mente on Arnell's counterclaim for breach of contract.

#### 2. Arnell's counterclaim for slander of title

Mente contends that it is entitled to summary judgment in its favor on Arnell's counterclaim for slander of title because Arnell cannot establish essential elements of its claim. Dkt. No. 37 at 15–20. Arnell initially opposed summary judgment, on the ground that there exist genuine issues of material fact in dispute. Dkt. No. 40 at 13–14. However, at the hearing on the motion, Arnell conceded that under Texas law, a claim for slander of title requires the loss of a specific sale, and Arnell concedes that it has suffered no such loss. Dkt. No. 43; *see A.H. Belo*

15

1    *Corp. v. Sanders*, 632 S.W.2d 145, 146 (Tex. 1982) (respondent "was required to prove the loss of
2    a specific sale or sales in order to recover on his slander of title action").
3        Accordingly, the Court grants summary judgment in favor of Mente on Arnell's
4    counterclaim for slander of title.

### C. Arnell's affirmative defenses

Mente argues that Arnell has not presented *any* evidence of the essential elements of nine of its affirmative defenses, and that Mente therefore is entitled to summary judgment in its favor. Specifically, Mente challenges Arnell's affirmative defenses of failure to mitigate damages, assumption of risk, estoppel, the applicable statute of limitations, set off, laches, waiver, unclean hands, and lack of notice. Dkt. No. 37 ¶¶ 55–66; Dkt. No. 41 at 14. In its opposition, Arnell points to *no* specific evidence supporting any of these affirmative defenses, and it makes only an oblique reference to the defense of "unclean hands." *See* Dkt. No. 40 at 13. Further, at the hearing on the motion, Arnell conceded that it had not made a sufficient showing to defeat summary judgment with respect to these affirmative defenses. Dkt. No. 43.

Accordingly, because Rule 56(c) mandates the entry of summary judgment against a party who has failed to show the existence of an element essential to that party's case on which that party would bear the burden of proof at trial, *Celotex*, 477 U.S. at 322, the Court grants summary judgment in favor of Mente on Arnell's affirmative defenses of failure to mitigate damages, assumption of risk, estoppel, the applicable statute of limitations, set off, laches, waiver, unclean hands, and lack of notice.

## IV. CONCLUSION

Based on the foregoing, plaintiff's partial motion for summary judgment is:

1. GRANTED in favor of Mente on Mente's claim for breach of contract.
2. GRANTED in favor of Mente on Arnell's counterclaim for breach of contract.
3. GRANTED in favor of Mente on Arnell's counterclaim for slander of title.
4. GRANTED in favor of Mente on Arnell's affirmative defenses of failure to mitigate damages, assumption of risk, estoppel, the applicable statute of limitations, set off, laches, waiver, unclean hands, and lack of notice.

16

This matter is set for a bench trial on February 9, 2022 and a pretrial conference on January 26, 2022. It is not clear whether, in view of this order, any claims or defenses remain to be tried. The parties shall confer and shall jointly file a further case management statement no later than January 12, 2022 advising the Court whether a trial is necessary and, if so, as to which claims or defenses.

**IT IS SO ORDERED.**

Dated: January 3, 2022

VIRGINIA K. DEMARCHI
United States Magistrate Judge